UNITED STATES DISTRICT COURT
FOR THE DISTICT OF COLUMBIA

JAMES L. CAUL )
8179 Edge Rock Way )
Apt. D301 )
Laurel, Maryland 20724 , )
)
    Plaintiff, )
)Civil Action No._____
    v. )
)
UNITED STATES CAPITOL POLICE BOARD )
119 D Street, N.E. )
Washington, D.C. 20510, )
)
    Defendant )
)

## COMPLAINT

COMES NOW Plaintiff James L. Caul, by and through undersigned counsel, and brings this Complaint against the United States Capitol Police Board ("USCP"), pursuant to the Congressional Accountability Act, 2 U.S.C. §§1401 *et seq*. (the "CAA"), for unlawful discrimination in the terms and conditions of his employment based on his race and for unlawful retaliation. In support thereof, Plaintiff states the following:

## JURISDICTION AND VENUE

1. Plaintiff James Caul filed a request for counseling with the Office of Compliance, pursuant to section 402 of the CAA, 2 U.S.C. §1402, on January 2, 2015. The proceeding before CAA was captioned *James Caul and U.S. Capitol Police, Employing Office*, Case No. 15-CP-16 (CV, AG, RP).

2. The counseling period began on January 2, 2015 and ended on February 2, 2015.

3. Pursuant to section 403 of the CAA, 2 U.S.C. §1403, Mr. Caul requested mediation. The mediation period began on February 9, 2015 and ended on May 6, 2015.

4. This action is brought within 90 days of the date of the end of the mediation period and, accordingly, this Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331 and section 408 of the CAA, 2 U.S.C. §1408.

5. Venue in this district is proper pursuant to 28 U.S.C. §1391(e)(1) because the defendant agency is subject to personal jurisdiction in the District of Columbia and a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

6. Mr. Caul is a civilian employee of the defendant, USCP, employed as a Communications Operator in the Library Communications Center ("LCCC"). Mr. Caul is an African-American male.

7. The U.S. Capitol Police Board oversees the operation of the USCP and is the entity that employs and pays employees of the U.S. Capitol Police; and is the employing office of Mr. Caul for purposes of the CAA. 2 U.S.C. §1301(9)(D).

## FACTUAL BACKGROUND

**A. Procedures Relating to Additional Duty and Holiday Assignments**

8. Employees of the USCP may be assigned to work overtime—known as "additional duty"—by their supervisors. When an employee works an additional duty shift, he or she is paid overtime at the rate of one and one half times their regular rate of

pay.  The ability to work additional duty shifts is therefore valuable to an employee because it affords an opportunity to supplement his or her base salary.

9. Employees assigned to work additional duty may find a substitute to work that additional duty in accordance with certain USCP procedures.  Under USCP Standard Operating Procedure ("SOP") COP-USB-003, issued on February 8, 2011 and still in effect, in order to have another employee substitute for the employee assigned additional duty, the latter employee (the "Requesting Employee") is to fill out a Form CP 1301.  On that form, the Requesting Employee is to fill in the name of the employee who will be working the additional duty in his or her place—the "Substitute Employee".

10. Under SOP COP-USB-003, in order to be a "Substitute Employee," an employee must be a full-time employee who has not yet worked more than 64 hours of additional duty during the applicable pay period, and who has not yet worked so many hours that the substitute duty would put the proposed substitute over the 64-hour limit.

11. Under that SOP, the Substitute Employee is also supposed to fill in his or her name and identification number, the division to which he or she is assigned and then to sign the Form 1301.  The Form is then required to be submitted to the Requesting Employee's section official or designee.  The section official or designee is supposed to then review, approve or deny the request.  If the request is approved, the commander or designee is to sign and date the form and provide copies to both employees.

12. The SOP provides that, "By signing the 1301, the substitute employee is acknowledging that they are working in the requesting employee's stead and is solely responsible for said additional duty."

13. A separate policy, SOP No. AC-000-20, governs the assignment of employees to work on official federal holidays. The SOP sets out the procedure for assigning personnel to work on holidays.

14. Under SOP AC-000-20, an employee assigned to work on a federal holiday may find a "qualified substitute," and arrange for that substitution by filling out and submitting a Form 1301-H.

15. To be a "qualified substitute" for an employee assigned to work on a holiday, the proposed substitute must be "not originally scheduled for duty on the holiday and [be an employee] whose day off does not fall on the holiday."

16. Holiday pay, but not additional duty pay, is paid to the substitute. The rate of holiday pay is the same as the employee's regular rate of pay. The ability to work on federal holidays, if the employee is willing and available, is valuable to the employee because it affords an opportunity to supplement his or her base pay through the ability to work additional days.

### B. Discriminatory Application of Procedures to Plaintiff

17. The procedures described in paragraphs 8 through 16 of this Complaint have not been uniformly applied to all employees, but have been applied in an arbitrary, shifting and capricious way that provides significant discretion to supervisors in the awarding of the ability to substitute for additional duty and for holiday assignments.

18. In the case of Mr. Caul, two of his supervisors, Michael Retherford, a civilian supervisor, and Sgt. Shawn Walton, both Caucasian males, have used this discretion to deprive Mr. Caul of overtime and holiday assignments based on his race, by applying these policies differently to Mr. Caul than to Caucasian employees.

19. Under SOP COP-USB-003 a Substitute Employee for whom a Form 1301 has been duly approved is responsible for showing up to work that additional duty shift and, therefore, should be required to show up and should be able to rely on working that shift, without any further action by anyone.

20. In practice, however, the originally assigned employee (the Requesting Employee on the Form 1301) is actually allowed to decide to work his or her originally assigned shift up to a certain period before the shift begins. Exactly what that period is supposed to be is an issue that is itself unclear, as various directives have been issued that contradict each other as well as the official Standard Operating Procedure.

21. In practice, if the originally assigned employee (Requesting Employee on the Form 1301) decides to work his or her originally assigned shift, the supervisor who signed the Form 1301, or some other supervisor, contacts the Substitute Employee in some way—again, not specified in any established procedure—to let that Substitute Employee know that he or she will not be needed to substitute. If the Requesting Employee does not change his or her mind about working, the supervisor contacts the Substitute Employee to let him or her know that his or her service is still needed.

22. The practice described in paragraphs 20 and 21 has continued through the present day.

23. This practice was further enabled by a policy issued in October 2014 that is contrary to USCP's own procedures. The USCP Absence and Leave Handbook, effective as of May 2012, provides that previously approved annual leave requests should be cancelled at least 48 hours in advance. On October 28, 2014, however an e-mail was sent to LCC1 employees informing them that Capt. Wills "has reinstated the minimum 1

hour rule regarding personnel canceling scheduled leave" and that in the future, all LCC personnel "will be allowed to cancel scheduled leave up to 1 hour prior to their normal reporting time. As a result, personnel SCHEDULED TO WORK additional duty will now have to call in and speak with an official to ascertain if your SCHEDULED additional duty is still needed, preferably on or prior to 1 hour before your scheduled reporting time. The supervisors will no longer be required to send emails, nor contact you to inform you of your status."

    24.    Not only was this informal directive contrary to established USCP policy, it was not in fact carried out. Rather, after this directive was issued in October 2014, supervisors have in fact continued to send e-mails and a Substitute Employee was not expected, or allowed, to work the substitute shift for which he or she had already been approved unless that Substitute Employee received an e-mail from a supervisor indicating that the substitute service was still needed.

    25.    During all times at which the events set out in the Complaint took place, employees of the LCC, including Mr. Caul, were not provided government-issued mobile telephones or personal digital assistant devices such as smartphones. If an e-mail was sent to an employee on his or her day off, to the employee's official USCP e-mail address, the employee would have no way to see it until he or she returned to work or unless he or she had her own personal computer or device and happened to check his or her e-mail that day.

    26.    However, employees are not expected or required to check their work e-mails on their regular days off and they are not, and cannot be, paid for any time spent on a day off checking or responding to USCP e-mails.

27. On September 3, 2014, Mr. Caul signed a Form 1301 to be a Substitute employee for Edgar Sheppard for Thursday, November 27, 2014. The Form was approved by Mr. Retherford and returned to Mr. Caul with date changed, by hand, to November 26, 2014—an effort to have Mr. Caul report to work for substitute additional duty shift on the wrong day. Mr. Caul discovered the alteration and confirmed he was to report for this additional duty shift on November 27, 2014.

28. Mr. Caul was approved to be a Substitute Employee for another employee, to work on November 14, 2014. On November 13, 2014, which Mr. Retherford knew was a day off for Mr. Caul, Mr. Retherford sent Mr. Caul an e-mail stating that he was still needed for substitute duty, knowing that Mr. Caul would not see the e-mail until Mr. Caul's next regular work day---.November 15—which would be the day *after* the day on which Mr. Caul was supposed to work the substitute shift.

29. Because Mr. Caul did not in fact see the e-mail until November 15, 2014, Mr. Caul did not show up for the substitute additional duty shift, resulting in Mr. Caul losing eight hours of overtime (additional duty) work. Mr. Retherford also reported to Mr. Caul's immediate supervisor that he had failed to show up for the assigned shift.

30. On December 8, 2014, Mr. Caul signed a Form CP 1301 as a Substitute Employee for Roger Ryan, to work Mr. Ryan's additional duty shift on December 27, 2014. The Form 1301 was duly approved by Mr. Caul's supervisor.

31. As of the afternoon of Christmas Day, December 25, 2014, when Mr. Caul left the office for his own days off over the Christmas holiday period, he had not been notified that his service as a substitute was needed, nor was his name posted on any work schedule.

32. Mr. Caul was in New York City at a sporting event on December 27, 2014, as he had not been told to show up for the substitute additional duty assignment on that day. In fact, Mr. Ryan had decided to work his originally assigned shift and actually reported for duty for that shift. Accordingly, Mr. Caul was not needed as a substitute for Mr. Ryan for that shift.

33. Nevertheless, Sgt. Walton decided to treat the situation as if Mr. Caul had failed to show up for the substitute additional duty. Sgt. Walton dismissed Mr. Ryan, leaving the shift unstaffed, and then proceeded to initiate the process for locating an employee who fails to show up for a shift, including contacting the employee's family members. Sgt. Walton also sent the local police to Mr. Caul's residence to try to find him, alarming Mr. Caul's neighbors and family members.

34. Mr. Caul later learned that Mr. Retherford had not forwarded the approved Form 1301 to the appropriate supervisor, so that Mr. Ryan's name remained on the schedule as the one assigned to work the shift. As a result, Mr. Ryan reported to duty for that shift and no one ever notified Mr. Caul that his substitute service would in fact be needed.

35. As a result of Mr. Retherford's actions, Mr. Caul lost eight hours of overtime (additional duty) work and, as alleged in further detail below, was threatened with disciplinary action for failing to report for an assigned shift.

36. Mr. Retherford has continued to send e-mails to Mr. Caul on his days off, notifying him either to show up or not show up for additional duty shifts as a Substitute Employee.

37. On information and belief, Mr. Retherford has not used taken actions like those described in paragraphs his discretion under the informal, unauthorized policies described in paragraphs 27 through 36, to deprive any Caucasian employee of the opportunity to work additional duty shifts, as he has repeatedly done in the case of Mr. Caul.

38. Roger Ryan filled out a Form 1301 for Mr. Caul to substitute for Mr. Ryan on January 24, 2015. Mr. Retherford approved the form, gave a copy to Mr. Ryan but withheld Mr. Caul's copy. Mr. Caul was made aware that the Form had been approved only through a conversation with Mr. Ryan. Had Mr. Caul's substitute service been required for January 24, 2015, and had he not happened to learn from Mr. Ryan that the form was approved, Mr. Caul again would have failed to report for the substitute duty as a result of the discriminatory treatment by Mr. Retherford.

39. On February 24, 2015, Mr. Caul received a "Personnel Performance Notes" memorandum, on Form CP-550, which can be used to make a negative entry in an employee's personnel file. This document was issued by Lt. Theresa Hook, a Caucasian female, "to clarify the expectations of the parties involved with CO-1301's and Additional Duty Substitution Requests." The document states that, on November 8, 2014, Captain Wills had enacted the following policy:

> Communications Officials will attempt to notify employees in advance that their scheduled additional duty is canceled. It is recommended that employees call in and check to confirm. Any employee that is schedule to work additional duty that can't be notified that its canceled and shows up for work will receive three (3) hours of time. However, the employee will work those hours in Comm performing whatever duties the officials assign.

40. The Form CP-550 provided to Mr. Caul further stated that, "To reiterate, if you are the substitute employee on a CP-1301, and you did not receive notification that

your additional duty has been canceled, show up for work. If you have any doubts, it is your responsibility to confirm that your additional duty is still needed."

41. Mr. Caul never received the November 8, 2014 directive and was not made aware of it until February 24, 2015, when he received the Form CP-550 from Lt. Hook. To Mr. Caul's knowledge, no other affected employee ever received this directive either.

42. The conflicting policies and practices described in paragraphs 20 through 24 and paragraphs 39-41 have created and continue to create a situation in which employees are now supposed to report for substitute additional duty if they are not notified, but in fact they usually are notified one way or the other as to whether their service is needed. And if they do comply with the November 8, 2014 directive and show up when they receive no notice one way or the other, they risk having reported when not in fact needed, and being paid for three hours, rather than for a full shift, and to do whatever work happens to be assigned in lieu of their regular work.

43. The conflicting policies and practices described in paragraphs 20 through 24 and 39 through 41 have conferred on supervisors a significant degree of discretion that has been, and can continue to be, used to discriminate against employees based on race.

44. With respect to holiday assignments, on September 15, 2014, a representative of Mr. Caul's supervisor asked Mr. Caul if he wanted to work on Veterans Day 2014, which occurred on November 11, 2014. Mr. Caul indicated that he would like to work that day. A Form 1301 had already been approved for Joy Myers to substitute for Michael Russell, but that date fell on Ms. Myers' regular day off. Accordingly, under SOP No. AC-000-20, Ms. Myers was not a "qualified substitute."

45. Mr. Caul's immediate supervisor, Sgt. Marvin Reid, an African American male, determined, based on that SOP, that Ms. Myers was not a qualified substitute and that another Form 1301 should be approved for Mr. Caul to substitute for Mr. Russell.

46. On September 18, 2014, however, Sgt. Reid told Mr. Caul that the "Captain," meaning Captain Jeffrey Wills, would have to decide which Form 1301 was "valid," and then advised Mr. Caul that the Form 1301 for Ms. Myers to substitute for Mr. Russell had somehow been reinstated. On information and belief the decision to reverse Sgt. Reid's determination and reinstate the substitution of Ms. Myers, was made by Captain Willis, who is a Caucasian male.

47. As a result Mr. Caul lost the opportunity to work the Veterans Day 2014 holiday.

48. On September 21, 2014, Sgt. Reid circulated a memo indicating that the policy set forth in SOP AC-000-20 did not apply to the communications officers in the LCC. On September 22, 2104, Mr. Caul wrote to the Chief of Police questioning whether such a decision had actually been made.

49. On October 1, 2014, Sgt. Reid wrote a "Personnel Performance Notes" memo, Form CO-550, indicating that Mr. Caul should have followed the chain of command and confirming that the policy in SOP AC-000-20 did not apply to communications officers in the LCC.

50. The following day, however, the commander of USCP Communications forwarded a directive from senior management reversing the policy set out in the "Personnel Notes" Mr. Caul had received the previous day, and stating that "[e]ffective

immediately, 1301's are not to be approved for holidays if the substitute employee would be working his/her day off...."

51. On information and belief, the application of an unauthorized exception to the policy in SOP AC-000-20, so as to deprive a communications officer of a holiday shift, was applied only in one case—to Mr. Caul---at the direction of Capt. Wills--and was never applied so as to deprive any Caucasian communications officer of the opportunity to work on a federal holiday at holiday pay.

**C. Retaliation**

52. On January 2, 2015, Mr. Caul filed his Request for Counseling with the Office of Compliance, pursuant to 2 U.S.C. §1402 (the "OOC Complaint").

53. On that same day, January 2, 2015, Mr. Caul filed a complaint with the USCP Office of Professional Responsibility.

54. Mr. Caul was immediately ordered to meet with Sgt. Walton, one of his supervisors, on January 5, 2015. At that meeting, Mr. Caul was provided a Form CP1009, a statement of rights related to administrative investigations, warning him that "you are being interviewed as part of an internal administrative investigation into alleged misconduct. You will be asked questions…related to the performance of your official duties or your fitness for duty…." During the meeting, Mr. Caul was told by Sgt. Walton that he, Mr. Caul, was being investigated for his conduct related to the December 27, 2015 incident described in paragraphs 30 through 35 of this Complaint.

55. On or about January 15, 2015, Lt. Theresa Hook, one of the supervisors of Mr. Caul's immediate supervisors, approached Mr. Caul at the LCC, with the OOC Complaint in her hand, and began flipping through the pages of the Complaint in front of

Mr. Caul. She challenged Mr. Caul's ability to prove the allegations in his OOC Complaint and then threatened to put a negative notation in Mr. Caul's personnel file for failing to show up for the substitute additional duty assignment on December 27, 2015.

**COUNT I—UNLAWFUL DISCRIMINATION BASED ON PLAINTIFF'S RACE**

56. Paragraphs 1 through 55 of this Complaint are incorporated as if set forth fully herein.

57. The actions of Mr. Retherford described in paragraphs 27 through 37 of this Complaint, inclusive, deprived Mr. Caul of the opportunity to work additional duty shifts, opportunities that he would have had if the USCP's own official policies had been followed.

58. Mr. Retherford has not taken similar actions to deprive any Caucasian employee of the opportunity to work additional duty shifts, as he has repeatedly done in the case of Mr. Caul.

59. The actions of Mr. Retherford described in paragraphs 27 through 37, constitute a discriminatory adverse employment action based on Mr. Caul's race, in violation of section 201(A)(1) of the CAA, 2 U.S.C. §1311(A)(1).

60. There was a causal connection between Mr. Caul's race and the actions of Mr. Retherford described in paragraphs 27 through 37.

61. The actions of Mr. Retherford described in paragraphs 27 through 37 adversely affected and altered the terms and conditions and privileges of Mr. Caul's employment and his employment status within the USCP.

62. As a direct and proximate cause of the unlawful discriminatory adverse employment practices and actions described in paragraphs 27 through 37, Mr. Caul

Mr. Caul. She challenged Mr. Caul's ability to prove the allegations in his OOC Complaint and then threatened to put a negative notation in Mr. Caul's personnel file for failing to show up for the substitute additional duty assignment on December 27, 2015.

**COUNT I—UNLAWFUL DISCRIMINATION BASED ON PLAINTIFF'S RACE**

56. Paragraphs 1 through 55 of this Complaint are incorporated as if set forth fully herein.

57. The actions of Mr. Retherford described in paragraphs 27 through 37 of this Complaint, inclusive, deprived Mr. Caul of the opportunity to work additional duty shifts, opportunities that he would have had if the USCP's own official policies had been followed.

58. Mr. Retherford has not taken similar actions to deprive any Caucasian employee of the opportunity to work additional duty shifts, as he has repeatedly done in the case of Mr. Caul.

59. The actions of Mr. Retherford described in paragraphs 27 through 37, constitute a discriminatory adverse employment action based on Mr. Caul's race, in violation of section 201(A)(1) of the CAA, 2 U.S.C. §1311(A)(1).

60. There was a causal connection between Mr. Caul's race and the actions of Mr. Retherford described in paragraphs 27 through 37.

61. The actions of Mr. Retherford described in paragraphs 27 through 37 adversely affected and altered the terms and conditions and privileges of Mr. Caul's employment and his employment status within the USCP.

62. As a direct and proximate cause of the unlawful discriminatory adverse employment practices and actions described in paragraphs 27 through 37, Mr. Caul

suffered damages including loss of the wages he would have earned by working the additional duty shifts referred to paragraph 29 and paragraph 35.

63. Capt. Wills' decision to deviate from the USCP's established official policy so as to allow an employee to work on a holiday that fell on her day off, deprived Mr. Caul of the opportunity to work that holiday as described in paragraphs 43 through 49 inclusive.

64. On information and belief, the deviation from established policy was never made so as to deprive any Caucasian employee of the opportunity work on a holiday.

65. There was a causal connection between Mr. Caul's race and the actions of Capt. Wills described in paragraphs 44 through 51.

66. The actions of Capt. Wills and other supervisors described in paragraphs 43 through 48 adversely affected and altered the terms and conditions and privileges of Mr. Caul's employment and his employment status within the USCP.

67. The actions described in paragraphs 43 through 48 constitute a discriminatory adverse employment action based on Mr. Caul's race, in violation of section 201(A)(1) of the CAA, 2 U.S.C. §1311(A)(1).

68. As a direct and proximate cause of the unlawful discriminatory adverse employment practices and actions described in paragraphs 44 through 51, Mr. Caul suffered damages including loss of the wages he would have earned by working the Veterans Day holiday and the inclusion of negative evaluations in his personnel file.

## COUNT II—UNLAWFUL RETALIATION

69. Paragraphs 1 through 68 of this Complaint are incorporated as if fully set forth herein.

70. The activities of Sgt. Walton and Lt. Hook set forth in paragraphs 52 through 55 constituted an unlawful retaliatory adverse employment action based on Mr. Caul's opposition to matters made unlawful by 2 U.S.C. §1311(a)(1), in violation of section 207(a).

71. The effect of the unlawful retaliatory employment activities and practices taken by USCP as described in paragraphs 52 through 55 of this Complaint was to adversely affect and alter the terms and conditions and privileges of Mr. Caul's employment and his employment status within the USCP.

72. As a direct and proximate cause of the unlawful retaliatory adverse employment practices and activities set forth above, Mr. Caul has suffered and continues to suffer damages, including lost wages, opportunities for advancement and other damages.

73. WHEREFORE, Plaintiff prays for the following relief:

74. That Plaintiff be awarded $15,000 in compensatory damages under the CAA, 2 U.S.C. 1311(b) and 1317(b) of the CAA;

75. That USCP be enjoined from taking any further retaliatory action against Mr. Caul;

76. That USCP be directed to place Plaintiff in the position he would be in but for USCP's unlawful discriminatory and unlawful retaliatory treatment;

77. That USCP be enjoined from continuing to implement and enforce self-contradictory policies and policies and directives that conflict with Standard Operating Procedures so as to afford supervisors the opportunity to discriminate against USCP employees on the basis of race or any other classification described in 2 U.S.C. 1311(a);

78. That Plaintiff be awarded attorneys' fees and costs; and

79. For such other and further relief as this Court deems just and proper.

Respectfully submitted,

 /s/  Joseph E. Sandler
Joseph E. Sandler, D.C. Bar No. 255919

SANDLER, REIFF, LAMB, ROSENSTEIN & BIRKENSTOCK, P.C.
1025 Vermont Ave, NW  Suite 300
Washington, DC 20005
Tel: 202.479.1111
Fax: 202.479.1115
sandler@sandlerreiff.com

Dated: August 3, 2015