# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAMES L. CAUL, | |
| Plaintiff, | |
| v. | Civil Action No. 15-1243 (BAH) |
| | Judge Beryl A. Howell |
| U.S. CAPITOL POLICE, | |
| Defendant. | |

## MEMORANDUM OPINION

The plaintiff, James Caul, brings this action against his employer, United States Capitol Police ("USCP" or "defendant"), pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1401 *et seq.*, asserting two claims for unlawful racial discrimination and retaliation. Am. Compl. (Preamble), ECF No. 4. The plaintiff claims that his supervisors "depriv[ed] [him] of overtime [] assignments based on his race," *id.* ¶ 18, and, after the plaintiff filed a request for counseling with the Office of Compliance, pursuant to 2 U.S.C. § 1402, the defendant initiated an "administrative investigation" of the plaintiff in retaliation, *id.* ¶ 54. Pending before the Court is the defendant's motion to dismiss the complaint for lack of subject matter jurisdiction stemming from the plaintiff's failure to exhaust administrative remedies and for failure to state a claim, under Federal Rules of Civil Procedure 12(b)(1) and (12)(b)(6), respectively. Def.'s Mot. Dismiss ("Def.'s Mot."), ECF No. 8. For the reasons set forth below, this motion is granted.

## I.    BACKGROUND

The plaintiff, an African-American male, is a civilian employee of the USCP, where he works as a Communications Operator in the Library Communications Center ("LCC"). Am. Compl. ¶ 6. The plaintiff's unlawful discrimination claim in Count One of the complaint asserts that he was unlawfully "deprive[d] . . . of overtime . . . assignments based on his race," *id.* ¶ 18,

based on five alleged instances where, in his view, his supervisor used "discretion [available] under the informal, unauthorized policies" to deprive him of "the opportunity to work additional duty," or overtime, shifts. *Id.* ¶ 37. The plaintiff admits, however, that in four of the five alleged discriminatory episodes, he asked for and received approval to work overtime and that he, in fact, worked overtime two of those times. *Id.* ¶¶ 27–28, 30, 38. His own allegations indicate that the plaintiff's request to work overtime was denied only once. *Id.* ¶ 46. Moreover, despite his challenge to the handling of his overtime shifts on these five occasions, the plaintiff has apparently been approved to perform, and performed, additional duty shifts on other occasions. *See Id.* ¶ 36 (alleging that his supervisor "has continued to send e-mails to [plaintiff] on his days off, notifying him either to show up or not show up for additional duty shifts as a Substitute Employee.").

Following review of USCP's policies governing the assignment of overtime, or "additional," duty, the five alleged discriminatory episodes underlying the race discrimination claim as well as the events alleged by the plaintiff underlying the retaliation claim are briefly summarized below.

### A.    USCP Policies Regarding Overtime Assignments

USCP employees may augment their regular salaries by working overtime shifts as substitutes for their absent co-workers. Am. Compl. ¶ 8. Overtime shifts worked on federal holidays ("holiday assignments") versus non-holidays ("additional duty shifts") are subject to separate policies. Each of the applicable policies are discussed below.

### 1.    Holiday Assignment Policy

USCP employees assigned to work on a federal holiday may request that another employee be substituted to fulfill this assignment by filling out Form 1301-H. Am. Compl. ¶ 14.

The plaintiff alleges that the governing policy, USCP Standard Operating Procedure ("SOP") AC-000-20, requires the substitute employee to be someone who was "'not originally scheduled for duty on the holiday and [] whose day off does not fall on the holiday.'"  *Id.* ¶ 15.  In other words, to qualify for a holiday assignment, the substitute employee would have been regularly scheduled to work on that day, but for the holiday.  The substitute employee receives his regular rate of pay for holiday assignments.  *Id.* ¶ 16.

### 2.    Additional Duty Shift Policies

USCP employees may also request to be assigned to additional duty shifts on non-federal holidays to substitute for absent USCP employees regularly scheduled for those shifts.  *Id.* ¶ 8. Substitute employees working the additional duty shifts are paid at one and a half times their regular rate.  *Id.*  USCP's governing policy, SOP COP-USB-003, issued on February 8, 2011, requires that the employee requesting substitution of another employee to cover a regularly scheduled shift fill out a Form CP 1301 listing the name of the substitute employee.  *Id.* ¶ 9. Once the requesting employee's "section official or designee" approves the form, the substitute employee becomes "'solely responsible for said additional duty.'"  *Id.* ¶¶ 11, 12.  The plaintiff alleges that, under SOP COP-USB-003, the substitute employee is "required to show up and should be able to rely on working that [additional duty] shift, without any further action by anyone."  *Id.* ¶ 19.

In practice, however, the plaintiff alleges that, because requesting employees may cancel their request for leave, substitute employees are not expected to appear for additional duty shifts unless a supervisor "contacts the Substitute Employee to let him . . . know that his . . . service is still needed."  *Id.* ¶ 21.  Indeed, under the USCP Absence and Leave Handbook, effective May 2012, requesting employees may cancel their "previously approved annual leave requests" up to

"48 hours in advance." *Id.* ¶ 23.  This 48-hour cancellation policy was revised, on October 28, 2014, for LCC employees, who were advised via email that LCC employees were permitted to cancel requests for leave up to an hour "'prior to their normal reporting time.'" *Id.* ¶ 23.  "'As a result, personnel SCHEDULED TO WORK additional duty will now have to call in and speak with an official to ascertain if your SCHEDULED additional duty is still needed, preferably on or prior to 1 hour before your scheduled reporting time.'" *Id.* (emphasis in original).  This email expressly adds that "'supervisors will no longer be required to send emails, nor contact [the substitute employee] of [his or her] status.'" *Id.*

The plaintiff alleges that the direction outlined in this email was "[n]ot only . . . contrary to established USCP policy, it was not in fact carried out." *Id.* ¶ 24.  The plaintiff avers that "supervisors . . . continued to send e-mails and a Substitute Employee was not expected, or allowed, to work the substitute shift for which he or she had already been approved unless that Substitute Employee received an e-mail from a supervisor indicating that the substitute service was still needed." *Id.*

### B.      Five Incidents of Alleged Racial Discrimination

The plaintiff alleges five incidents of discrimination occurring over the five-month period between September 3, 2014 and January 24, 2015, based on the handling of overtime assignments.

### 1.      Additional Duty Shift on November 27, 2014

First, the plaintiff alleges that, on September 3, 2014, his civilian supervisor, a white male, discriminated against him by changing, "by hand," the date of the Form 1301, approving the plaintiff for additional duty shift on November 27, 2014, which was written as "November 26, 2014."  *Id.* ¶¶ 18, 27.  The plaintiff alleges that this was an effort to "have [the plaintiff]

report to work for substitute additional duty shift on the wrong day." *Id.* The plaintiff

discovered the error, however, and ultimately reported to this additional duty shift on the correct

day. *Id.*

### 2. Holiday Duty Shift on Veterans Day 2014

Second, the plaintiff alleges that, on September 15, 2014, he was approved to work on

Veterans Day 2014, even though a Form 1301 had already been approved for another employee.

*Id.* ¶ 44. The plaintiff's first-level police supervisor discovered that the original substitute

employee was not a "'qualified substitute'" under SOP AC-000-20 because Veterans Day fell on

the original substitute employee's regular day off. *Id.* Consequently, this first-level supervisor

contacted the plaintiff to determine whether he would be interested in working a holiday

assignment on Veterans Day in the stead of the original substitute employee. *Id.* ¶¶ 44, 45. The

plaintiff subsequently filed a Form 1301 to work the holiday assignment, which was approved.

*Id.* ¶ 44. The plaintiff's second-level supervisor reversed that approval, however, and decided

that the original substitute, not the plaintiff, could work the Veterans Day holiday assignment.

*Id.* ¶ 46.

Subsequently, on September 21, 2014, the plaintiff's immediate supervisor "circulated a

memo indicating that the policy set forth in SOP AC-000-20 did not apply to the

communications officers in the LCC." *Id.* ¶ 48. On September 22, 2014, the plaintiff challenged

the legitimacy of the policy exception reflected in the September 21 memorandum with the Chief

of Police. *Id.* On October 1, 2014, the plaintiff's immediate supervisor wrote a "Personnel

Performance Notes" memorandum, noting that the plaintiff "should have followed the chain of

command and confirming that the policy in SOP AC-000-20 did not apply to the

communications officers in the LCC." *Id.* ¶ 49. The next day, the commander of the USCP

communications department reversed the exception reflected in the September 21 memorandum, and clarified that "'[e]ffective immediately, 1301's are not to be approved for holidays if the substitute employee would be working his/her day off . . . .'" *Id.* ¶ 50.  The plaintiff avers that the exception set forth in the September 21 memorandum, allowing LCC employees to work holiday assignments even if the holiday fell on a regular day off, was "applied only in one case— to [the plaintiff]—. . . and was never applied so as to deprive any Caucasian communications officer of the opportunity to work on a federal holiday at holiday pay." *Id.* ¶ 51.

### 3.      Additional Duty Shift on November 14, 2014

Third, the plaintiff alleges that he missed an overtime assignment on November 14, 2014, for which he was already approved, because his civilian supervisor did not inform him that his service was required until too late.  *Id.* ¶¶ 28–29.  The plaintiff avers that he received the confirmation email on November 13, 2014, a day the plaintiff alleges his supervisor "knew was a day off for [the plaintiff]," and "kn[e]w[] that [the plaintiff] would not see the e-mail until [the plaintiff's] next regular work day—November 15—which would be the day *after* the day on which [the plaintiff] was supposed to work the substitute shift." *Id.*(emphasis in original).  As a consequence, the plaintiff did not "show up for the substitute additional duty shift" because "he did not in fact see the e-mail [confirmation] until November 15, 2014." *Id.* ¶ 29.  Due to this communications breakdown, the plaintiff "los[t] eight hours of overtime," and was "reported to [the plaintiff's] immediate supervisor" for "fail[ing] to show up for the assigned shift." *Id.*

### 4.      Additional Duty Shift on December 27, 2014

Fourth, the plaintiff was approved for additional duty on December 27, 2014.  *Id.* ¶ 30. The plaintiff alleges that, due to his supervisor not "forward[ing] the approved Form 1301 to the appropriate supervisor," the requesting employee's name "remained on the schedule as the one

assigned to work the shift." *Id.* ¶ 34.  As a consequence, the plaintiff was not notified, by
December 25, 2014, that he was needed to work the additional duty shift, *id.*¶ 31, and the
requesting employee, in fact, "reported for duty for that shift," *id.* ¶ 32.  Nevertheless, the
plaintiff alleges that the shift supervisor "decided to treat the situation as if [the plaintiff] had
failed to show up for the substitute additional duty." *Id.* ¶ 33.  The requesting employee who did
report to duty was dismissed, and local police were sent to the plaintiff's "residence to try to find
him, alarming [his] neighbors and family members." *Id.*

Due to his failure to appear for substitute additional duty on December 27, 2014, the
plaintiff alleges that on February 24, 2015, he received a "'Personnel Performance Notes'
memorandum . . ., which can be used to make a negative entry in an employee's personnel file."
*Id.* ¶ 39.  This memorandum stated that, per a November 8, 2014 directive, though
"[c]ommunications officials will attempt to notify employees in advance that their scheduled
additional duty is canceled," "[i]t is recommended that employees call in and check to confirm."
*Id.*  The plaintiff avers that he "never received the November 8, 2014 directive and was not made
aware of it until February 24, 2015," and that to his knowledge, "no other affected employees
ever received this directive either." *Id.* ¶ 41.

### 5.      Additional Duty Shift on January 24, 2015

Fifth, the plaintiff alleges that a requesting employee filled out a Form 1301 requesting
the plaintiff, as a substitute employee, to work additional duty on January 24, 2015. *Id.* ¶ 38.
The plaintiff's supervisor "approved the form, gave a copy to [the requesting employee] but
withheld [the plaintiff's] copy." *Id.*  The plaintiff learned that the request was approved through
conversation with the requesting employee, and subsequently reported to work. *Id.*  He alleges,
however, "had he not happened to learn from [the requesting employee] that the form was

approved, [the plaintiff] again would have failed to report for the substitute duty as a result of the discriminatory treatment by [his supervisor]."  *Id.*

### C.      Alleged Retaliation

After the first four incidents of allegedly discriminatory handling of overtime assignments, and shortly after the plaintiff's supervisor had treated his absence on December 27, 2014 as a failure "to show up for the substitute additional duty," *id.* ¶ 33, the plaintiff, on January 2, 2015, filed a Request for Counseling with the Office of Compliance ("Request for Counseling"), *id.* ¶ 52, and a complaint with the USCP Office of Professional Responsibility, *id.* ¶ 53.  The plaintiff alleges that he was "immediately ordered to meet with" his immediate police supervisor on January 5, 2015.  *Id.* ¶ 54.  During the meeting, the plaintiff was given a Form CP1009, warning that he was "'being interviewed as part of an internal administrative investigation into alleged misconduct'" relating to his failure to appear for his approved additional duty on December 27, 2014.  *Id.* ¶ 54.  The plaintiff alleges that on or about January 15, 2015, another one of his second-level supervisors confronted him with the Request for Counseling, "challenged [his] ability to prove the allegations in his OOC [Request for Counseling] and then threatened to put a negative notation in [the plaintiff's] personnel file for failing to show up for the substitute additional duty assignment on December 27, 201[4]."  *Id.* ¶ 55.

### D.      Procedural History

After filing his Request for Counseling, the plaintiff entered into counseling from January 2, 2015 through February 2, 2015.  *Id.* ¶ 2.  The plaintiff then requested mediation, which began on February 9, 2015, and ended on May 6, 2015.  *Id.* ¶ 3.  On August 3, 2015, the plaintiff filed

the complaint initiating this lawsuit and, subsequently, on August 20, 2015, filed the Amended

Complaint.  *See generally* Compl., ECF No. 1; Am. Compl.

## II.    LEGAL STANDARD

### A.    FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the

plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over his claim.

*Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) *cert. denied*, 136 S. Ct. 900 (2016).

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by

Constitution and statute.'"  *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v.

Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden .

. . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir.

2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and

statutory authority exist for us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v.

Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d

192, 196 (D.C. Cir. 1992)).  Absent subject matter jurisdiction over a case, the court must

dismiss it.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006); Fᴇᴅ. R. Cɪᴠ. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true

all uncontroverted material factual allegations contained in the complaint and "'construe the

complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the

facts alleged' and upon such facts determine jurisdictional questions."  *Am. Nat'l Ins. Co. v.

FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972

(D.C. Cir. 2005)).  The court need not accept inferences drawn by the plaintiff, however, if those

inferences are unsupported by facts alleged in the complaint or amount merely to legal

conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may

"'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'"

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quoting *Haase v.

Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)), and consider facts developed in the record beyond

the complaint, *id. See also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (in

disposing of motion to dismiss for lack of subject matter jurisdiction, "where necessary, the court

may consider the complaint supplemented by undisputed facts evidenced in the record, or the

complaint supplemented by undisputed facts plus the court's resolution of disputed facts").  To

do so, "the district court may consider materials outside the pleadings." *Jerome Stevens Pharm.,

Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Belhas v. Ya'Alon*, 515 F.3d 1279,

1281 (D.C. Cir. 2008) (examining materials outside the pleadings in ruling on a Rule 12(b)(1)

motion to dismiss for lack of subject matter jurisdiction); *Coal. for Underground Expansion v.

Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (noting that courts may consider materials outside

the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter

jurisdiction).

### B.  FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

"'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face.'"  *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual

content that is more than "'merely consistent with' a defendant's liability," but "allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* at 678  (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "'grounds'" of "'entitle[ment] to relief,'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id.* at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construe all reasonable inferences in favor of the plaintiff.  *Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, No. 14-5156, 2016 WL 1319727, at *4 (D.C. Cir. Apr. 5, 2016) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor." (citing *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014))).  The Court "need not, however, 'accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint.'" *Nurriddin*, 2016 WL 1319727, at *4 (alteration in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## III.   DISCUSSION

The plaintiff brings this lawsuit under the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301 *et seq.*, which, in relevant part, applies Title VII of the Civil Rights Act, 42

U.S.C. §§ 2000e *et seq.*, and ten other remedial federal statutes, "to the legislative branch of the

Federal Government," 2 U.S.C. § 1302(a).  Thus, "[a]mong other protections, the CAA bars

discrimination based on race, 2 U.S.C. § 1311(a)(1), and includes an anti-retaliation provision, 2

U.S.C. § 1317(a)."  *Howard v. Office of the Chief Admin. Officer of the U.S. House of*

*Representatives*, 720 F.3d 939, 946 (D.C. Cir. 2013).  Similar to the statutory framework set up

in Title VII, the CAA requires plaintiffs to first exhaust their administrative remedies.  2 U.S.C.

§ 1401; *see also Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 705 (D.C. Cir.

2009) (finding the counseling and mediation exhaustion requirements to be jurisdictional).

The administrative steps that plaintiffs asserting CAA claims must exhaust include, first,

making a "request [for] counseling by the Office [of Compliance]" within 180 days of the date of

the alleged violation.  2 U.S.C. § 1402(a).  Second, within fifteen days after the plaintiff's receipt

of "notice of the end of the counseling period," *id.* § 1403(a), which lasts no longer than thirty

days, *id.* § 1402(b), the employee shall file a request for mediation, *id.* § 1403(a).  Third, "[n]ot

later than 90 days, but not sooner than 30 days, after the end of the period of mediation," the

plaintiff may either file a complaint with the OOC or file a civil action in "the United States

district court for the district in which the employee is employed or for the District of Columbia."

*Id.* § 1404.  A civil action may only be commenced, however, by a plaintiff who "seek[s] redress

for a violation for which the employee has completed counseling and mediation."  *Id.* § 1408(a).

Fully exhausted claims of discrimination under the CAA are analyzed under the three-

part framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Howard*, 720 F.3d

at 947–48 (applying *McDonnell Douglas* framework to employment discrimination suit brought

under CAA); *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492–94 (D.C. Cir. 2008);

*Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 291 (D.D.C. 2012).  Under this

framework, the plaintiff bears the initial burden of making out a *prima facie* case of discrimination, by showing that (1) he "'is a member of a protected class;'" (2) he "'suffered an adverse employment action;'" and (3) "'the unfavorable action gives rise to an inference of discrimination.'"  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  When "'the employer asserts a legitimate, non-discriminatory reason' for an adverse employment action, the *prima facie* case 'drops out of the picture,' and a plaintiff must simply prove 'that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin.'"  *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting *Brady*, 520 F.3d at 493–94).

The defendant contends that the plaintiff's complaint should be dismissed because (1) the plaintiff has failed to exhaust administrative remedies for alleged discriminatory and retaliatory events occurring after January 2, 2015, when his only Request for Counseling was filed, barring the exercise of jurisdiction over any events occurring after January 2, 2015 ("Post-Request Events"); and (2) the plaintiff fails to state a claim regarding any alleged incident occurring prior to the filing of his Request for Counseling ("Pre-Request Events"), because he fails to allege that any of these events resulted in an adverse employment action.  Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem.") at 1, ECF No. 8-1.  Each of these challenges is discussed *seriatim* below.

## A.   DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

As discussed above, section 1408 of the CAA confers jurisdiction upon the district courts "over any civil action commenced under section 1404 of this title and this section by a covered employee who has completed counseling under section 1402 of this title and mediation under section 1403 of this title."  2 U.S.C. § 1408(a).  The D.C. Circuit has instructed that "it is

apparent from the plain terms of the text that Congress intended counseling and mediation to be jurisdictional requirements." *Blackmon-Malloy*, 575 F.3d at 705.  Counseling and mediation are completed when the employee (1) "timely request[s] counseling and mediation," (2) does not "thwart[] mediation by failing to give the employing office notice of the claim upon request," and (3) waits to "receiv[e] notice of the end of mediation before filing suit." *Id.* at 711.  The plaintiff bringing a CAA claim bears the burden of establishing jurisdiction.  *See Forras v. Rauf*, 812 F.3d 1102, 1105 n.4 (D.C. Cir. 2016) ("With respect to subject-matter jurisdiction, the Plaintiffs . . . bore the burden of establishing jurisdiction . . . .").

The plaintiff filed his sole Request for Counseling on January 2, 2015, but alleges in his Amended Complaint three incidents that occurred subsequent to that date, namely: one incident involving the handling of an overtime request and two incidents that provide the factual basis for his claim of retaliation.  Am. Compl. ¶¶ 38, 54–55.  The defendant argues that the timing of the plaintiff's request for counseling is fatal to these three Post-Request Incidents.  Specifically, the defendant contends that the plaintiff has failed to show that these Post-Request Incidents have been administratively exhausted and, consequently, should be dismissed for lack of subject matter jurisdiction.[1]  Def.'s Mem. at 8.  The Court agrees.

The plaintiff has neither alleged that he timely requested counseling for the Post-Request Incidents nor produced any evidence to that effect.  Instead, he relies entirely on the assertion that because "both of the incidents on which the retaliation claim is based took place well within the counseling period . . . , there is nothing about the timing of these incidents that would have

---

[1]    The defendant counts as a separate discriminatory incident the Personnel Performance Notes memorandum the plaintiff received on February 24, 2015.  Def.'s Mem. at 8.  The Amended Complaint indicates, however, that this Personnel Performance note is related to the fourth alleged discriminatory incident, on December 27, 2014, rather than a stand-alone incident.  Am. Compl. ¶ 68.

precluded them from being raised during counseling and mediation."[2]  Pl.'s Opp'n Def.'s Mot.

Dismiss ("Pl.'s Opp'n") at 4, ECF No. 9.  Even if the plaintiff were correct that the "'description

on the Request for Counseling Form alone may not be dispositive,'" he cannot satisfy his burden

of establishing jurisdiction simply by speculating that his retaliation claim *could* have met the

statutory requirements for jurisdiction.  *Id.* at 4 (citing *Moran v. U.S. Capitol Police Bd.*, 820 F.

Supp. 2d 48, 55 (D.D.C. 2011)).

    Judges on this Court have consistently held that "where a plaintiff fails to present

evidence to 'determine whether that [adequate notice, etc.] occurred,' he 'fail[s] to meet h[is]

burden to establish jurisdiction.'"  *Ruffin v. Cong. Budget Office*, 79 F. Supp. 3d 246, 249

(D.D.C. 2015) (quoting *Moran*, 820 F. Supp. 2d at 55).  In *Ruffin*, the plaintiff sought to assert a

hostile work environment claim under the CAA, but failed to raise the claim in his request for

counseling.  *Id.* at 248.  The court acknowledged that the "'description on the Request for

Counseling Form alone may not be dispositive,' as to whether a claim was raised and

exhausted," and that "'confidentiality precludes courts from inquiring into what actually

happened during the counseling period.'"  *Id.* at 249 (quoting *Moran*, 820 F. Supp. 2d at 55).

Nonetheless, the *Ruffin* Court concluded that the plaintiff failed to meet his burden to establish

jurisdiction, where he has not produced any "documentation to either gainsay or complement the

---

[2]     The plaintiff strains to defend the Post-Request Incidents on the grounds that "USCP [does not] contend that it lacked adequate notice of the retaliation claim before the commencement of this action."  Pl.'s Opp'n at 4–5. This argument is misplaced because merely giving the defendant notice is not enough to establish subject matter jurisdiction, which instead requires that the plaintiff complete counseling and mediation over the claims he seeks to bring in this Court.  2 U.S.C. § 1408(a); *Blackmon-Malloy*, 575 F.3d at 708.  The plaintiff fails to rebut the defendant's denial of receipt of any timely request for counseling as to the Post-Request Incidents, including those underlying the plaintiff's retaliation claim, and, as a result, the Court cannot conclude that counseling and mediation were completed as required.  Def.'s Mem. at 8–9.  Moreover, the plaintiff failed to address the defendant's argument that the discriminatory incident on January 24, 2015 was not administratively exhausted, *see generally* Pl.'s Opp'n at 3–5, and, consequently, this defense argument is deemed conceded,  *see* LCvR 7(b); *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[LCvR 7(b) is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."), in addition to other legal infirmities related to the alleged January 24, 2015, *see infra* n. 3.

notice of invocation of mediation." *Id.* at 250.  Mere speculation as to what may have occurred

during the counseling period is simply inadequate.  *See also Moran*, 820 F. Supp. 2d 48 at 55

(dismissing the plaintiff's retaliation claim for failure to establish jurisdiction under the CAA

where the only evidence submitted were the plaintiff's three requests for counseling, none of

which clearly indicated a request for counseling on her retaliation claim and, consequently, "the

Court cannot ascertain on this record whether the claim was mediated or not, and therefore,

plaintiff has not carried her burden with respect to jurisdiction on the [retaliation claim]").

Accordingly, the plaintiff's discrimination and retaliation claims based on the Post-

Request Incidents are dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of

administrative exhaustion, which is a pre-requisite for this Court to exercise subject matter

jurisdiction.

### B.    DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The plaintiff's race-discrimination claim is also based on four incidents relating to the

handling of his requested overtime shifts that occurred prior to the filing of his Request for

Counseling.  To establish a *prima facie* case of discrimination under the CAA, which borrows

from the *McDonnell Douglas* framework, the plaintiff must demonstrate that (1) he "'is a

member of a protected class;'" (2) he "'suffered an adverse employment action;'" and (3) "'the

unfavorable action gives rise to an inference of discrimination.'"  *Wiley*, 511 F.3d at 155

(quoting *Brown*, 199 F.3d at 452). In this case, the complaint fails to allege sufficiently any

"adverse employment action" stemming from the four Pre-Request Incidents.

Not all unfavorable actions that occur in the workplace, even if perceived as

discriminatory by the employee, rise to the level of an actionable adverse employment action.

Instead, the plaintiff must show "'a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)).  In other words, the plaintiff must "'experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Id.* (quoting *Douglas*, 559 F.3d at 552 (alteration in original)).  This limiting principle is necessary because "'not everything that makes an employee unhappy is an actionable adverse action.'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)).  Otherwise, "'[m]inor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit.'" *Id.*

In the defendant's view, the plaintiff fails to state a legally cognizable discrimination claim because he fails to allege that he suffered an "adverse employment action" during any of the four alleged Pre-Request Incidents.  Def.'s Mem. at 9–12.  At the outset, the plaintiff makes no allegation that he has been terminated, demoted, transferred or subject to any change in job title or description, reduction in pay, benefits, regular work hours or responsibilities.  Instead, his racial discrimination claim is based solely on his allegation that the handling of his overtime requests on a handful of occasions resulted in either jeopardizing or losing overtime opportunities.  Am. Compl. ¶¶ 27–35, 38, 44–47.  Indeed, the plaintiff does not allege that he is routinely or even frequently denied overtime opportunities.  To the contrary, with respect to the challenged Pre-Request Incidents, the plaintiff's requests for additional duty shifts were

approved, with a single exception, in which his supervisors appeared to differ on the appropriate

application of the holiday duty policy. *Id.* ¶ 45–46.

Undaunted, the plaintiff contends that he has adequately pleaded an adverse employment

action because "loss of an opportunity to work overtime, by an employee known to seek such

opportunities, does constitute such a tangible loss of benefits." Pl.'s Opp'n at 9.  The D.C.

Circuit has not directly considered the issue of whether and under what circumstances the denial

of an overtime opportunity may amount to an adverse employment action. Other Judges on this

Court, however, have imposed limitations on when allegations regarding overtime may support a

discrimination or retaliation claim. These limitations recognize that overtime pay represents "a

tangible monetary advantage," but nevertheless "working overtime for supplementary pay is not

universally regarded as desirable." *Bell v. Gonzalez*, 398 F. Supp. 2d 78, 97 (D.D.C. 2005).

Moreover, the D.C. Circuit has cautioned against using discrimination and retaliation claims to

"engage in 'judicial micromanagement of business practices.'" *Baloch v. Kempthorne*, 550 F.3d

1191, 1197 (D.C. Cir. 2008) (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556

(D.C. Cir. 1997)).

Thus, in evaluating the adversity of overtime related allegations in employment

discrimination lawsuits, the context matters.  Alleged denials of overtime opportunities may

suffice to support a discrimination or retaliation claim when those denials are associated with a

fundamental alteration in the conditions of employment, such as a transfer or reassignment of

duties that has a significant adverse impact on overtime opportunities, and the plaintiff

demonstrates that the "'plaintiff in the past sought opportunities for overtime pay or it was

otherwise known to defendant that plaintiff desired such opportunities.'" *Sims v. District of*

*Columbia*, 33 F. Supp. 3d 1, 7 (D.D.C. 2014) (quoting *Bell*, 398 F. Supp. 2d at 97); *Saint-Jean v. District of Columbia*, 844 F. Supp. 2d 16, 21–22 (D.D.C. 2012).

For example, in *Bell*, the plaintiff's challenge to a lateral transfer was permitted to proceed as an adverse employment action when such transfer precluded opportunities to earn overtime pay.  398 F. Supp. 2d at 96–97.  Similarly, other courts have found denial of overtime opportunities rise to the level of adverse employment actions only in situations where such denial is frequent and recurring, resulting in a fundamental change in the terms, conditions, or privileges of the plaintiff's employment.  *See, e.g.*, *Johnson v. Manpower Prof'l Servs., Inc.*, 442 Fed. App'x 977, 982–83 (5th Cir. 2011) (holding that denial of overtime pay was an adverse employment action where the plaintiff's status was changed from "overtime non-exempt" to "overtime exempt") ; *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007) (finding the one-time denial of a detail assignment may constitute an adverse employment action because the detail assignment would have provided necessary training to enable the plaintiff to secure future recurring overtime opportunities, and distinguishing the loss of "significant and recurring" overtime opportunities, which may constitute an adverse employment action, from the loss of "insignificant and nonrecurring" overtime opportunities); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 (11th Cir. 2002) (finding plaintiff's allegation that he was "'totally blackballed' from overtime opportunities open to other employees" may constitute an adverse employment action); *Saint-Jean*, 844 F. Supp. 2d at 21–22 (finding adverse action where the plaintiffs alleged that they were denied overtime work unless they paid illegal kickbacks in exchange).

The duration and frequency of the denial of overtime opportunities are both significant factors in evaluating the adversity presented by such a discrimination claim.  Thus, in *Sims*,

another Judge on this Court rejected a discrimination claim where the plaintiff challenged two short-term reassignments, which did not provide opportunities for overtime, because those details "lasted no more than [] several days," and the plaintiff "lost the potential for overtime pay on a limited number of occasions."  33 F. Supp. 3d at 8; *see also Hall v. Dekalb Cty. Gov't*, 503 F. App'x 781, 784–85 (11th Cir. 2013) ("the occasional denial of comp time or overtime did not constitute an adverse employment action," where the plaintiffs "acknowledged that they had consistently earned comp time and overtime . . . and personnel records showed that they did not receive significantly less comp time or overtime than white employees"); *Hargrow v. Federal Express Corp.*, No. 07-15623, 2009 WL 226039, at 1 (9th Cir. 2009) ("The denial of a day off, the denial of overtime hours for one week during the employment period, and the denial of a schedule change similarly do not rise to the level of adverse employment actions."); *Hart v. Life Care Ctr. of Plano*, 243 F. App'x 816, 818 (5th Cir. 2007) (finding that the plaintiff's allegation of a single denial of overtime did not constitute an adverse employment action); *Shaw v. Donahoe*, No. 11-2232-STA-dkv, No. 11-2859-STA-tmp, 2014 U.S. Dist. LEXIS 37534, at *35–37 (W.D. Tenn. Feb. 18, 2014) (noting that "[l]ost overtime opportunities can be adverse employment actions when the overtime opportunities lost were both relatively regular in their occurrence and significant in the monetary impact" and concluding that plaintiff failed to establish discrimination claim based on alleged denial of overtime when she "does not allege that the opportunity for overtime was completely foreclosed to her—rather, she alleges that on a few, distinct occasions, she was not asked to work overtime on her off days.").

Set against this background about the limited circumstances when a lost opportunity to earn overtime pay may amount to an adverse employment action, the Court now turns to review

the sufficiency of the plaintiff's allegations of adversity arising from the handling of his additional duty and holiday assignments.

### 1.      Plaintiff's Allegations Regarding Additional Duty Shifts

The plaintiff alleges that, on three separate occasions, his supervisor acted with discriminatory intent to "deprive" the plaintiff of overtime hours.  Am. Compl. ¶ 8.  First, the plaintiff alleges his civilian supervisor intentionally changed the date for which the plaintiff was approved to work an additional duty shift from November 27, 2014 to November 26, 2014, in "an effort to have [the plaintiff] report to work for substitute additional duty shift on the wrong day" ("First Additional Duty Incident").  *Id.* ¶ 27.  The plaintiff discovered the error and ultimately reported for the additional duty shift on the correct date.  *Id.* ¶ 27.  Second, after approving the plaintiff's request to work an additional duty shift on November 14, 2014, the plaintiff's supervisor sent him a confirmation email alerting him to report to work, per the unwritten practice, the day before, on November 13, 2014 ("Second Additional Duty Incident"). *Id.* ¶ 28.  The plaintiff alleges that he did not see this confirmation email because November 13 was his day off, and he alleges that he "would have no way to see [the email] until he . . . returned to work or unless he . . . had h[is] own personal computer or device and happened to check his . . . e-mail that day."  *Id.* ¶ 25.  Consequently, the plaintiff did not report for his approved additional duty shift, and lost the "eight hours of overtime (additional duty) work."  *Id.* ¶ 29.  Third, the plaintiff alleges that after he had been approved to work an additional duty shift on December 27, 2014, his civilian supervisor failed to forward the approval to the appropriate personnel ("Third Additional Duty Incident").  *Id.* ¶¶ 30, 34.  Consequently, because the plaintiff, by December 25, 2014, "had not been notified that his service as a substitute was needed, nor was his name posted on any work schedule," *id.* ¶ 31, he "assumed that his service

was not in fact needed and left town on vacation," Pl.'s Opp'n at 8–9, thereby losing another eight hours of overtime work.

The defendant argues that the supervisor's allegedly discriminatory acts did not actually deny the plaintiff the opportunity to work additional duty shifts during any of the alleged incidents, and, therefore, none of the alleged acts rise to the level of an adverse employment action.  The Court agrees, as detailed below.

### a.        First Additional Duty Incident

The plaintiff himself acknowledges that he did not suffer any materially adverse consequences as a result of the First Additional Duty Incident because he caught and corrected, in time, the error on the form approving his additional duty shift.  Am. Compl. ¶ 27.  Though the plaintiff may have been inconvenienced, the supervisor's mistake did not result in any "tangible objective harm" to the plaintiff. [3]  *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (requiring the plaintiff "to submit biweekly reports on the status of her work" was a "minor 'inconvenience[]'" that did not "'rise to the level of adverse action' necessary to support a claim" (quoting *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002))); *Turner v. U.S. Capitol Police Bd.*, 983 F. Supp. 2d 98, 105 (D.D.C. 2013) (the plaintiff's supervisor's "attempt" to negatively affect the plaintiff's job performance rating, which did not cause the plaintiff any financial harm or loss of professional opportunities, was not an adverse employment action).  In fact, the

---

[3]        For this reason, the alleged incident on January 24, 2015, would not have constituted a material adverse employment action, even if the plaintiff had administratively exhausted that claim.  The plaintiff alleges that, on January 24, 2015, his civilian supervisor, after approving him for overtime, failed to give him a copy of the approved form.  Am. Compl. ¶ 38.  The plaintiff ultimately learned from a third-party that his form was approved and, consequently, appeared for the overtime assignment.  *Id.*  In other words, the plaintiff did not suffer an objectively tangible harm due to his supervisor's actions.

plaintiff appears to have conceded this argument because he failed to address the First Additional

Duty Incident in his opposition brief.  *See* LCvR 7(b); *Wannall*, 775 F.3d at 428.

### b.     Second Additional Duty Incident

The Second Additional Duty Incident is cited by the plaintiff as discriminatory because

he believes that his supervisor "deceive[d] [him] into missing an additional duty opportunity by

sending him notice in a way that was certain not to be timely received."  Pl.'s Opp'n at 7.

According to the plaintiff, the confirmation email was sent to his work email on his day off, and

he was not "expected or required to check [his] work e-mails on [his] regular days off."  Am.

Compl. ¶ 26.  In other words, the plaintiff shifts "responsib[ility] for the missed overtime," Pl.'s

Opp'n at 7, to his supervisor, rather than accepting any responsibility to check his work email for

confirmation himself.

The plaintiff's own allegations fall short of supporting his claim that the timing of his

supervisor's notification email effectively denied him the opportunity to work his approved

additional duty for two reasons.  First, the plaintiff concedes that he is capable of checking his

work email outside of work, using any "personal computer or device."  Am. Compl. ¶ 25.  The

plaintiff also admits that substitute employees working overtime typically "receive[] an e-mail

from a supervisor indicating that the substitute service was still needed."  *Id.* ¶ 24.  Thus, the

possibility that a supervisor may send just this kind of notification email the day before the

employee is scheduled for an overtime shift should be anticipated by any USCP employee.

Checking work email from a personal computer the day before any scheduled overtime shift

would impose only minimal burdens on any USCP employee, including the plaintiff.

Second, the plaintiff was provided an alternative method of confirming whether his

service was needed for his approved additional duty shift.  The plaintiff alleges that, on October

28, 2014, he received an email sent to all LCC employees, directing all "personnel

SCHEDULED TO WORK additional duty . . . to call in and speak with an official to ascertain if

your SCHEDULED additional duty is still needed, preferably on or prior to 1 hour before your

scheduled reporting time."  Am. Compl. ¶ 23 (emphasis in original).  Additionally, the email

expressly added that "supervisors will no longer be required to send emails, nor contact you to

inform you of your status."  *Id.*  The plaintiff urges the Court to discount the import of this email,

alleging that this email was an "informal directive contrary to established USCP policy," and that

"supervisors have in fact continued to send e-mails" to confirm that the substitute employee is

still required for the approved overtime shift.  *Id.* ¶ 24.  Even if the supervisors continued to send

notification emails to substitute employees, nothing stopped the plaintiff from calling his

supervisor the day before his approved overtime shift to confirm that he was needed.  Indeed, he

was encouraged to make such a call by the October 28, 2014 "informal directive."

The plaintiff contends that he was the subject of unlawful discrimination when his

supervisor failed to notify him two days, instead of one day, in advance because, allegedly, his

supervisor does not send confirmation emails to Caucasian employees on their days off.  Even if

this allegation were true that his supervisor "has not taken similar actions to deprive any

Caucasian employee[s] of the opportunity to work additional duty shifts," Am. Compl. ¶ 58, the

supervisor's action in sending a confirmation email at an inconvenient time for the plaintiff can

hardly be described as a material adverse employment action that effected "'a *significant* change

in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing *significant* change in benefits,'" *Kline v. Berry*,

404 F. App'x 505, 506 (D.C. Cir. 2010) (emphasis added) (quoting *Taylor v. Small*, 350 F.3d

1286, 1293 (D.C. Cir. 2003)) (declining to find that "loss of administrative access to a database

[plaintiff] was not authorized to use, denial of secretarial help on a day when she was busy, refusal of her request for a private office when more senior employees worked in cubicles, an email from her boss criticizing her work, and denial of her request to reschedule her lunch break on a particular day" were actionable under Title VII).  As the D.C. Circuit cautioned, "not everything that makes an employee unhappy is an actionable adverse action." *Russell*, 257 F.3d at 818.  Here, the sending of a courtesy notification email at a time when the plaintiff could easily check his work email simply does not amount an adverse employment action, particularly because official USCP policy expressly discouraged employees' reliance on such confirmation emails before reporting to overtime duty.[4]

Consequently, the Court finds that the supervisor's action in emailing the plaintiff the day before his overtime shift, though on the plaintiff's day off, is not an actionable adverse employment action.

### c.   Third Additional Duty Incident

The Third Additional Duty Incident also centers on the plaintiff's supervisor's allegedly discriminatory behavior, which resulted in the plaintiff not receiving a notification to work an additional duty shift, on December 27, 2014, for which shift he had been previously approved. By contrast to the Second Additional Duty Incident, the plaintiff's supervisor neglected to send any confirmation email because he had forgotten to forward the approved form to the appropriate personnel.  Am. Compl. ¶ 34.  Regardless, the plaintiff admits that his request for this overtime shift was approved, and that he knew he was approved.  *Id.* ¶¶ 30, 33 ("Nevertheless, [the shift

---

[4]      Notwithstanding the "informal directive" sent on October 28, 2014, which the plaintiff alleges to be "contrary to established USCP policy," Am. Compl. ¶ 24, the plaintiff himself alleges that "[u]nder SOP COP-USB-003[,] a Substitute Employee for whom a Form 1301 has been duly approved is responsible for showing up to work that additional duty shift and, therefore, should be required to show up and should be able to rely on working that shift, without any further action by anyone," *Id.* ¶ 19.

supervisor] decided to treat the situation as if [the plaintiff] had failed to show up for the substitute additional duty."). Therefore, the only consequence of the plaintiff's supervisor's failure to forward the approved form is that no one notified the plaintiff that his service was still required.

As discussed above, however, simply neglecting to send the plaintiff a courtesy notification email, when the plaintiff knew he was approved for additional duty, and had an alternative method of confirming whether he was still needed, does not constitute a material adverse employment action.[5]  "'[M]ere idiosyncrasies of personal preference are not sufficient o state an injury,'" *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002) (quoting *Stewart v. Ashcroft*, 211 F. Supp. 2d 166, 175 (D.D.C. 2002)), and "many workplace slights . . . fall below the requisite threshold," even if the slights are "related to conditions of employment," *Baird*, 662 F.3d at 1250.

Accordingly, to the extent that the plaintiff's discrimination claim is based on his missing the additional duty shifts on November 14, 2014 and December 27, 2014, the claim is dismissed.

### 2.      Discriminatory Event Related to Holiday Assignment

The plaintiff alleges that he was denied a holiday assignment to work on Veterans Day 2014, when his request was rejected in favor of another substitute employee, who had made an earlier request, even though that employee was not a "qualified substitute" under the governing policy, SOP AC-000-20.  Am. Compl. ¶¶ 44, 46.  Even assuming as true the plaintiff's allegation that the substitute employee was not a qualified substitute, the defendant contends that "los[ing]

---

[5]      The Third Additional Duty Incident occurred in late December, a month after the Second Additional Duty Incident.  At this point, the plaintiff should have been aware, based on his experience during the Second Additional Duty Incident, that his supervisor might not notify him two days in advance that he was still required to report to his approved overtime shift.  Nevertheless, the plaintiff, who was scheduled to work the additional duty shift on December 27, 2014, left to go to New York on December 25, 2014 to attend "a sporting event."  Am. Compl. ¶¶ 31, 32.

the potential for earning overtime on one occasion [] does not constitute a material adverse action." Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply") at 4–5 (citing *Sims*, 33 F. Supp. 3d at 8), ECF No. 10.[6]  The Court agrees.

The Court takes the extraordinary step of asserting itself into the employment relationship only where the plaintiff has suffered, for unlawful reasons, "a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing *significant* change in benefits." *Taylor*, 350 F.3d at 1293 (emphasis added) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  A one-time denial of overtime request in the context of the plaintiff's admissions that his requests for overtime were regularly approved, does not cause a "*significant* change in benefits."[7]  *See Hall*, 503 F. App'x at 784–85; *Hargrow*, 2009 WL 226039, at *1; *Hart*, 243 F. App'x at 818; *Sims*, 33 F. Supp. 3d at 8.

---

[6]      The defendant addressed this particular incident for the first time in its reply brief.  Generally, new arguments raised for the first time in reply may be disregarded due to concern that the opposing party would lose an opportunity to respond.  *See Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 77 n.17 (D.D.C. 2015) (citing *McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986)); *Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 22 (D.D.C. 2013).  The plaintiff, however, was clearly on notice of the defendant's position that he "has not alleged that he suffered any adverse employment action."  Pl.'s Opp'n at 2.  Therefore, notwithstanding the defendant's failure to address this particular holiday assignment incident in its moving papers, the plaintiff was given the opportunity to respond to the defendant's argument that the denial of the plaintiff's request for this one holiday assignment was insufficient to allege an adverse employment action.  *See* Pl.'s Opp'n at 2, 8.  In any event, the Court has the inherent authority to "dismiss a complaint *sua sponte* for failure to state a claim if it is 'patently obvious' that the plaintiff cannot prevail."  *Scott v. United States*, 275 Fed. App'x. 21 (D.C. Cir. 2008) (per curiam) (quoting *Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 727 (D.C. Cir. 1990) (per curiam)).

[7]      While the complaint contains no allegations regarding the amount of money the plaintiff lost due to his lack of diligence in confirming the dates of his approved additional duty shifts and from the one instance where he was denied a holiday assignment, the D.C. Circuit has opined that even a one-time monetary loss may constitute an adverse employment action.  *Russell*, 257 F.3d at 819 (holding that a single negative performance evaluation may constitute an adverse employment action where it may impede the plaintiff's future professional development and directly resulted in a performance bonus that was $500 smaller).  By contrast to *Russell,* the plaintiff here has not alleged that the single denial of overtime assignment that he challenges has adversely impacted his professional development and standing.

Accordingly, the plaintiff's allegation regarding a single denial of holiday assignment does not rise to the level of an adverse employment action sufficient to support an employment discrimination claim.

## IV.     Conclusion

For the reasons outlined above, the defendant's motion to dismiss is granted and the plaintiff's complaint is dismissed in its entirety.

An appropriate order will accompany this Memorandum Opinion.

Date: May 19, 2016

_____

BERYL A. HOWELL
Chief Judge